700 A.2d 798

Corey DAVIS, a Minor, etc.

v.

Eugene GOODMAN, et al.

No. 1829, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Sept. 25, 1997.

382

Scott E. Nevin (Saul E. Kerpelman, on the brief), Baltimore, for appellants.

Angus R. Everton (Charles N. Ketterman and Mason, Ketterman & Morgan, on the brief for appellee, Rochkind), Baltimore, Paul G. Donoghue (Rollins, Smalkin, Richards & Mackie, on the brief for appellees, Goodman, et al.), Baltimore, for Appellees.

Argued before HARRELL, SALMON and THIEME, JJ.

SALMON, Judge.

In this lead paint poisoning case, appellants present us with a host of questions, only one of which is of interest to most members of the bar. That question is the second that we will address. It involves an interpretation of Maryland Rule 2–415(g). We must decide whether an objection at deposition to the form of a question or to any other error or irregularity that might be obviated if the objection were made during deposition must be specific or whether the objection is preserved by merely uttering the word "objection." We hold that the ground for the objection must be stated with specificity.

## BACKGROUND

Corey Davis ("Corey"), born December 31, 1987, claims to have suffered brain injury due to his residency in two houses located in Baltimore City. Starting when he was six months old, Corey lived at 2627 Francis Street with his mother, Angela Norwood. The Francis Street address was owned by Eugene Goodman, Ann Goodman, Marc Attman, and Debra Attman, t/a Attsgood Realty (hereinafter referred to collectively as "the Attsgoods"). Corey, at fifteen months of age, moved from Francis Street to 4716 Park Heights Avenue where he lived with his mother. The house on Park Heights Avenue was owned by Stanley Rochkind, t/a S&S Partnership

(hereinafter ·"S&S"). On June 7, 1989, about four months after Corey moved to the premises, the Baltimore City Health Department notified S&S that the Park Heights address had thirty-eight areas of lead-based paint. Corey continued to reside at the premises owned by S&S until August 1989, when he was hospitalized and underwent therapy for lead poisoning. Thereafter, Corey went to live with his paternal grandmother, but his mother remained at the Park Heights address until February 1990.

In March 1990, Ms. Norwood, individually and on behalf of Corey, sued S&S and the Attsgoods in the Circuit Court for Baltimore City. The Attsgoods filed a motion for summary judgment, which was granted by Judge Thomas Ward on August 18, 1995. In September 1996, the case, as against S&S, was tried before a jury (Heller, Ellen, J., presiding). The jury found that S&S was not negligent; it also found that while S&S had violated the Consumer Protection Act, Corey had not been injured by that violation. Counsel for Corey filed a motion for new trial, which was denied. Corey and his mother then noted this timely appeal and raise ten issues, which we have reordered and reworded:

1. Did the motions judge err in granting summary judgment in favor of the Attsgoods?

2. Did the trial court commit reversible error by overruling appellants' counsel's objections to questions of S&S's expert at his *de bene esse* deposition, when the objection at trial was to the form of the question but at deposition no ground for the objection was stated?

3. Did the trial court err by allowing evidence to be presented to the jury that raised an inference that the appellant was exposed to lead-based paint at Francis Street?

4. Did the trial court abuse its discretion by allowing S&S's expert neurologist to testify by videotape as to the source(s) of the appellant's exposure to lead-based paint?

5. Did the trial court abuse its discretion by preventing appellants from presenting evidence of the full extent of Stanley Rochkind's experience and knowledge about the hazards associated with lead paint?

6. Did the trial court err by allowing the introduction of certain business records without the proper foundation?

7. Did the court abuse its discretion by allowing S&S's fact witness to testify to matters that were not within the witness's personal knowledge?

8. Did the trial court commit reversible error by refusing to give two of appellants' proposed jury instructions?

9. Did the trial court abuse its discretion by failing to grant a new trial when the jury rendered inconsistent verdicts?

10. Did the trial court's general conduct throughout the trial substantially deprive the appellant of the right to a fair trial?

## ISSUE I

### A. Summary Judgment Ruling—Facts in Light Most Favorable to Appellants

In June 1988, Corey moved into the Francis Street address, an old unrehabilitated townhouse with flaking and chipping paint on the interior walls, baseboards, and windowsills, and on the front exterior walls, door, and window frames. Corey's mother complained to the Attsgoods about the paint problems when she first rented the premises. Promises were made by the Attsgoods to remedy the chipping and flaking paint problem, but these promises were never fulfilled.

On March 2, 1989, which coincidentally was the same date that Corey moved from the Francis Street premises, Corey's blood was tested. The test showed the lead level in his blood to be 31 mcg/dc. An acceptable lead blood level in 1989 was considered to be 25 mcg/dc or less.

David H. James, M.D., a professor of pediatrics at the University of Tennessee with experience in treating children

exposed to lead paint, was named as an expert by appellants. Dr. James was deposed by counsel for the Attsgoods and questioned extensively as to the basis for his opinion that the Francis Street home contained lead-based paint during Corey's residency. Dr. James testified at deposition that: the house was "very old"; most very old houses in Baltimore City were painted with lead-based paint; the condition of the house was described by Corey's mother as "poor," with chipping and flaking paint; and therefore, it certainly "sound[ed] like that house would be a good source for lead." He admitted that there was no direct evidence that the house had, in fact, been painted with lead-based paint, and he acknowledged that "he was making an assumption that there was leadbased paint at 2627 Francis Street."

> The Attsgoods moved for summary judgment and argued: [T]here is no direct evidence that there was lead paint on the property. Instead the expert [Dr. James] bases his opinion that lead-base paint existed because the house was [ ] old and the paint was peeling, as described by the mother. Thus, the conclusion that the exposure came from 2627 Francis Street is drawn from hearsay.[1] In fact, Dr. James admits to having done no research on the history of lead paint in the Baltimore Metropolitan area. In order for the [p]laintiff to demonstrate there exists facts sufficient to support an inference that the poisoning was the result of the 2627 Francis [Street] property[,] there must be reliable data to show the existence of lead paint.

(Footnotes omitted.) No other ground for summary judgment was advanced.

Unbeknownst to Dr. James, the exterior of 2627 Francis Street had been tested for lead-based paint on May 5, 1995— five days before Dr. James's deposition. Troy Baker was the inspector who tested the exterior of the premises. The interi-

---

**1.** The "hearsay" objection by the Attsgoods was frivolous. Dr. James was not required to inspect the house personally. As an expert, he was permitted to base his opinion on the observations of other witnesses (such as Ms. Norwood).

or was not tested. Mr. Baker's test revealed that lead-based paint existed on the exterior front wall of the house and on the exterior basement windows, left and right front windows, and on the front door.

Appellants, in opposition to the Attsgoods' summary judgment motion, filed an affidavit by Troy Baker relating that he had found lead-based paint on the exterior of the house and that, in his opinion, lead-based paint was present on the exterior of the house when Corey resided there.

Appellants also filed affidavits from Ms. Norwood, Corey's mother, and Dr. James. Ms. Norwood's affidavit read, in pertinent part, as follows:

When we first moved into 2627 Francis [Street] the front exterior of the home also had flaking and chipping paint on the door, walls and window frames. Corey Davis and I would sit out on the front step everyday when it was too hot to be inside. I did not know that the chipping paint that was right next to us on the front step contained lead-based paint.

Dr. James's affidavit included the following:

7. Based on my training, knowledge and experience, the medical records of Corey Davis, the May 9, 1995 report of Troy Baker noting presence o[f] lead-based paint on the exterior surfaces of 2627 Francis Street, and the Affidavit of Angela Norwood, I am of the opinion, within a reasonable degree of medical probability that Corey Davis was exposed to lead-based paint while residing at 2627 Francis Street.

8. I am of an opinion within a reasonable degree of medical probability that Corey Davis was exposed to lead-based paint while sitting in front of 2627 Francis Street on an everyday basis.

9. I am of an opinion within a reasonable degree of medical probability that Corey Davis' exposure to lead-based paint at 2627 Francis Street was a substantial factor [sic] to the injuries that he sustained to his central nervous system as a result of having elevated blood lead levels.

The Attsgoods, on August 15, 1995, responded to plaintiff/appellant's opposition. In the response, the Attsgoods changed the entire thrust of their motion. As previously noted, the Attsgoods initially maintained that appellants had failed to present competent evidence that the residence leased to appellants contained lead-based paint. But faced with the fact that testing had shown lead-based paint on the exterior of the house and, as a consequence, Dr. James was no longer basing his opinion upon mere circumstantial evidence, the Attsgoods pointed out a new (purported) deficiency. The Attsgoods filed no affidavit or other sworn material to support their new contention. Instead, they based the revised motion on the following *ipse dixit:*

Since Dr. James now claims that the poisoning occurred from the minor's exposure to the exterior paint of the building, there must be some evidence that in fact the child ingested or came into contact with the paint. Merely sitting outside on the steps is hardly sufficient to establish poisoning caused by lead-based paint, unless, of course, there is medical evidence to suggest otherwise. The [a]ffidavit of Angela Norwood does not indicate that in fact there was ever any exposure....

From that premise, the Attsgoods proceeded to argue:

It is a familiar rule of evidence that a witness, in order to qualify as an expert, should have such special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate. It is sufficient the expert has in some way gained such experience in the matter as would entitle his evidence to credit. *Wilson v. State,* 181 Md. 1, 26 A.2d 770 (1942)]. Consequently, Dr. James must establish by medical evidence a connection between being outside of a building with lead paint and actual exposure.

Three days after the filing of the Attsgoods' memorandum raising this new issue, a hearing was held on the summary judgment motion. In granting summary judgment, the mo-

tions judge pointed out what he perceived to be two deficiencies in plaintiffs' case. Neither of these alleged deficiencies was relied upon by the Attsgoods when they originally filed their motion for summary judgment. First, the court observed that the plaintiffs had presented no proof that the Attsgoods knew of lead-based paint in the interior of the Francis Street address. Second, although plaintiffs had proved that the exterior of the house contained deteriorated lead-based paint, they had failed to prove that Corey had been injured by exposure to that paint—the argument first raised by the Attsgoods only three days earlier. The court stated:

So the question is whether the house on the outside, where there is evidence of chipping and flaking paint and evidence of lead paint, is the evidence sufficient to carry this case on to the next step which is a jury trial to determine whether or not this child received his or her ingestion at Francis Street.

In order to do that, there are several ways, of course, that can be done. In this particular case, the plaintiff's [sic] lawyers tried to do it these two ways. One, by producing testimony of the medical authority, of which has been referred to in argument. The other is showing this child, through the affidavit of Angela Norwood, the exact words are "Corey Davis and I would sit out on the front steps every day when it was too hot to be inside. I did not know that the chipping paint that was right next to us on the front steps contained lead-base paint."

Mr. Buckley [counsel for the Attsgoods] argues that this is not sufficient to bridge the gap. Mr. Mensh [counsel for appellants] argues that the experts he has produced can testify that exposure to lead paint was sufficient to at least contribute to the condition that the child was found with.

I've held consistently, and I'm going to hold again in this case, that the doctor's testimony, simply saying that because the house has lead paint in it, is sufficient to cause exposure. *It's not true.* I've listened to the testimony to at least one of these two experts and he's never said that. There has to be a condition present sufficient to, not only expose the

child, but there must be activity on the part of the child to actually cause this.

Now, on the inside, [lead poisoning] can come from the air. It can come from a lot of different facts. But on the outside it's more difficult to show. And to simply show that a person was sitting on the outside steps next to peeling and flaking paint without any other activity, including the ability of the child to have, for example, played in the ground next to the wall where the flaking and chipping paint was and, therefore, perhaps ingested it, as a young child will often put everything in their mouth and so forth.

In this particular case, there is no evidence of that. I do not believe that the gap has been jumped with respect to exterior lead paint and therefore the motion is granted....

(Emphasis added.)

## B. Standard of Review

Any party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.... The response to a motion ... shall identify with particularity the material facts that are disputed.... The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

Md. Rule 2–501(a), (b), and (e) (1993). *Thus, a moving party must set forth sufficient grounds for summary judgment.* Although the movant is not required to support his motion with an affidavit unless he files it "before the day on which the adverse party's initial pleading or motion is filed," *see* Md. Rule 2–501(a), he must support his various contentions by placing before the court facts that would be admissible in evidence or otherwise detailing the absence of evidence in the record to support a cause of action. *See*

*Washington Homes, Inc. v. Interstate Land Dev. Co., Inc.,* 281 Md. 712, 716 [382 A.2d 555] (1978).

*Bond v. NIBCO, Inc.,* 96 Md.App. 127, 134, 623 A.2d 731 (1993) (emphasis added).

[A] party seeking summary judgment *always bears the initial responsibility of informing the [circuit] court of the basis for its motion, and identifying those portions of "the pleadings,* depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," *which it believes demonstrate the absence of a genuine issue of material fact.*

*Id.* at 136, 623 A.2d 731 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

### C. The Initial Motion for Summary Judgment

The Attsgoods appropriately noted a deficiency in the plaintiffs' case when they first filed their summary judgment motion. At that point it appeared that the plaintiffs could not prove that Corey was injured while he resided at the Francis Street residence because there was no competent evidence that the premises contained any lead-based paint. Obviously, the mere fact that most old houses in Baltimore have lead-based paint does not mean that a particular old Baltimore house has a similar deficiency. But by filing the affidavits of Ms. Norwood and Troy Baker, appellants showed that there was at least a genuine issue of material fact as to whether the exterior of the house contained deteriorated lead-based paint at the time Corey lived there. Thus, the Attsgoods were unquestionably not entitled to summary judgment on the basis set forth in their initial memorandum.

### D. Notice

The Attsgoods say in their brief that:

The trial court properly granted appellees' motion for summary judgment as to appellants' negligence claim [because] there was insufficient evidence that appellees had notice of

lead paint at 2627 Francis Street during the period of appellants' residence ....[2]

They proceed to argue:

A landlord is not liable in tort for the lead paint poisoning of a tenant unless "the landlord either knows or has reason to know of the condition and has a reasonable opportunity to correct it." *Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 673 [645 A.2d 1147] (1994); *Brown v. Wheeler,* 109 Md.App. 710 [675 A.2d 1032] (1996).

■ As shown previously, the trial judge did grant summary judgment, based, in part, on the fact that the Attsgoods did not have notice of the existence of lead paint on the interior of the premises. This fact, however, was never a ground for summary judgment advanced by the Attsgoods in their summary judgment motion. A non-moving party is not required to respond to issues not raised by the moving parties. *Hartford Accident and Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 262, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). Put another way, a trial judge cannot, *sua sponte,* and without prior warning, appropriately grant summary judgment based on the plaintiff's failure to prove an element of his or her case if the defendant has not previously contended that the plaintiff's proof was deficient as to that element. *Bond,* 96 Md.App. at 136, 623 A.2d 731. The trial judge, therefore, should not have granted summary judgment based on plaintiff's failure to prove notice.

## E. The Second Ground Advanced by the Trial Court for Grant of Summary Judgment

■ Although the motions judge granted summary judgment, in part, on the ground that deteriorated lead-based paint on the exterior of the house did not cause Corey harm, the Attsgoods do not even argue in their brief that the

---

2. This statement is not technically true. In regard to the deteriorated exterior lead-based paint, the court did not grant judgment on the ground that the landlord was not shown to have notice.

motions judge was correct in this regard. This fact is of importance because, with an exception not here relevant, we will not affirm the grant of summary judgment on a ground not relied upon by the trial judge.[3] *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *Scarlett Harbor,* 109 Md.App. at 241, 674 A.2d 106.

In the motion judge's opinion, a child's lead blood levels cannot become elevated simply because the child is in the immediate vicinity of exterior chipping or flaking exterior lead-based paint. Lead-paint poisoning, in the trial judge's view, can come from the air (i.e., air-bourne particles) if the child is exposed to interior lead-based paint; but when a house has deteriorated lead-based paint on the exterior, a child cannot become injuriously exposed to that lead-based paint merely by being in the immediate vicinity of it. Judge Ward believed that there must be more direct exposure. Dr. James had a contrary view. As previously shown, Dr. James, an experienced pediatrician, filed an affidavit in which he stated that in his opinion, to a reasonable degree of medical probability, Corey's exposure to deteriorated lead-based paint on the exterior of the premises leased from the Attsgoods was a "substantial factor" in leading to the "injuries [Corey] sustained to his central nervous system...." The motions judge plainly did not believe that Dr. James was credible. He characterized what Dr. James said as "not true" and thus rejected the opinions set forth in Dr. James's affidavit. If Judge Ward were the factfinder, his finding would be accorded great deference. But no principle is more firmly ingrained in summary judgment jurisprudence than that a motions judge should not decide issues of credibility. Additionally, a

---

**3.** The exception is: If the alternative ground is one upon which the circuit court would have had no discretion to deny summary judgment, summary judgment may be granted for a reason not relied upon by the trial court. *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995). It is only when the motion is based upon a pure issue of law that could not properly be submitted to a trier of fact, that we will affirm on an alternative ground. *Presbyterian Univ. Hosp. v. Wilson,* 99 Md.App. 305, 313–14, 637 A.2d 486 (1994), *aff'd,* 337 Md. 541, 654 A.2d 1324 (1995).

judge, in deciding a summary judgment motion, is not empowered to take judicial notice of the answers to complicated medical issues such as the issue of causation discussed in Dr. James's affidavit. For the foregoing reasons, we shall reverse the judgment entered in favor of the Attsgoods.

## ISSUE II

### Trial Court's Rulings on Objections Made by Appellants' Counsel at Deposition

S&S took the videotaped deposition of Dr. Lawrence Charnas, a specialist in neurology, who was of the opinion, to a reasonable degree of medical probability, that Corey experienced "no significant exposure [to lead-based paint] at 4716 Park Heights Avenue."

In his deposition, Dr. Charnas went on to give the reasons for his opinion:

The reason I can state that is he had two types of chemicals measured in his blood during treatment for his lead poisoning. One was the measurement of lead itself. The other is a measurement of something called FEP. As we talked about, lead levels can drop very rapidly on the basis of treatment with certain kinds of medicines. FEP, on the other hand, is a chemical that is contained within red blood cells and is a longer-term measure, on the order of three to four months, of what is happening with lead exposure.

His FEP level remained more or less unchanged from the date where it was first noted to be elevated, prior to moving to the Park Heights address, through his initial treatment with DMSA, and then began to drop in the latter part of the fall of—or, rather, the summer of 1989 into the winter of 1989. The—when one sees an elevated FEP that stays the same and then drops, that indicates that there had been lead exposure ongoing for several months prior to moving to the Park Heights address, and that's, that's, within a reasonable degree of medical certainty, is the source of his body burden of lead which caused his rebound.

DMSA are the initials for the medication administered to Corey at the Kennedy Center in August 1989. According to Dr. Charnas, DMSA "is particularly good in dropping or getting rid of lead that is in the blood."

Later in his deposition, Dr. Charnas testified, again to a reasonable degree of medical certainty, that "there was no reason to believe [that Corey] . . . had any injury whatsoever" due to the fact that he lived at property owned by S&S.

Plaintiffs' counsel objected during Dr. Charnas's deposition to numerous questions asked by counsel for S&S. On one occasion counsel said, "Objection, leading" but on all other occasions, he merely said, "Objection" or "Objection, move to strike." Many—perhaps most—of plaintiffs' objections were to questions that were perfectly proper.

At trial, plaintiffs' counsel brought to the judge's attention several questions that were "not in proper form" because the questions called for Dr. Charnas to express an opinion even though the questioner did not ask him whether the opinion was held to a "reasonable degree of medical probability." [4] The trial judge overruled these objections and opined that in order to preserve an objection as to the form of a question the objection at deposition must be specific so that opposing counsel would have an opportunity to correct his mistake(s).

Maryland Rule 2–415(g) reads:

**Objections.**—All objections made during a deposition shall be recorded with the testimony. An objection to the manner of taking a deposition, to the form of questions or answers, to the oath or affirmation, to the conduct of the parties, or to any other kind of error or irregularity that might be obviated or removed if objected to at the time of its occurrence is waived unless a timely objection is made during the deposition. An objection to the competency of a

---

**4.** An objection that questions put to an expert at deposition were not framed in terms of "reasonable medical certainty" has been held to be an objection to form. *See Turnbo by Capra v. City of St. Charles,* 932 S.W.2d 851, 856 (Mo.App.1996).

witness or to the competency, relevancy, or materiality of testimony is not waived by failure to make it before or during a deposition unless the ground of the objection is one that might have been obviated or removed if presented at that time.

Rule 2–415(f) applies to videotaped depositions, but a party seeking to preserve an objection at the videotaped deposition must also comply with Rule 2–416(g), which provides:

**Objections.**—The officer shall keep a log of all objections made during the deposition and shall reference them to the time shown on the clock on camera or to the videotape or audiotape indicator. Evidence objected to shall be taken subject to the objection. A party intending to offer a videotape or audiotape deposition in evidence shall notify the court and all parties in writing of that intent and of the parts of the deposition to be offered within sufficient time to allow for objections to be made and acted upon before the trial or hearing. Objections to all or part of the deposition shall be made in writing within sufficient time to allow for rulings on them and for editing of the tape before the trial or hearing. The court may permit further designations and objections as justice may require. In excluding objectionable testimony or objections of counsel, the court may order that an edited copy of the videotape or audiotape be made or that the person playing the tape at trial suppress the objectionable portions of the tape. In no event, however, shall the original videotape or audiotape be affected by any editing process.

After referring us to Rules 2–415 and 2–416, appellants argue:

Nowhere in these Rules is it mentioned that reasons for the objections, as to form, must be given on the record. More specifically on point is Rule 2–517 that states that grounds for the objections during a trial need not be stated unless specifically directed by the court. Since the appellee chose to videotape the testimony of his medical expert, and not

have the benefit of the trial court's immediate directions, the trial court could not make such a ruling after the fact.

Md. Rule 2–517(a) reads:

**Objections to Evidence.**—An objection to the admission of evidence shall be made at the time the evidence is offered *or as soon thereafter as the grounds for objection become apparent.* Otherwise, the objection is waived. The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs. The court shall rule upon the objection promptly. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court may admit the evidence subject to the introduction of additional evidence sufficient to support a finding of the fulfillment of the condition. The objection is waived unless, at some time before final argument in a jury trial or before the entry of judgment in a court trial, the objecting party moves to strike the evidence on the ground that the condition was not fulfilled.

As can be seen, Rule 2–415(g) and Rule 2–517(a) have a major difference that is here important. Rule 2–517(a) explicitly provides that (with certain exceptions) counsel need not state the ground for an objection. Rule 2–415(g), on the other hand, says that, to preserve an objection, one must object *to the error or irregularity;* the rule does not say that one may merely object *to the question or answer.*

Can it be said that a lawyer who merely says the word "objection" immediately after a question or answer has objected "to the manner of taking a deposition" or "to the form of the question or answer" or "to any other error or irregularity that might be obviated or removed if objected to at the time of its occurrence"? We think not—counsel has merely objected to the question or answer, not to any error or irregularity contained therein. For that reason, the language used in Rule 2–415(g) strongly suggests at least that an objection to any error or irregularity that can be immediately corrected must be specific.

Besides the difference in terminology between Rules 2–517(a) and 2–415(g), there are practical reasons to distinguish what must be said at trial to preserve an objection from what should be said at deposition. At trial, a judge, at the request of a party, or acting *sua sponte,* can direct counsel to give the basis for an objection. But at deposition, because no impartial arbiter is present, attorneys cannot be forced to say anything. Accordingly, the opportunity of a questioner to recognize and correct an error at deposition is reduced. Thus, the need for specificity in the two forums is markedly different.

In interpreting the Maryland Rules of Procedure, we apply the same rules of construction as we use when interpreting statutes, *Kerpelman v. Smith, Somerville & Case, L.L.C.,* 115 Md.App. 353, 357, 693 A.2d 357, *cert. denied,* 346 Md. 241, 695 A.2d 1229 (1997), and the most basic rule of statutory construction is that courts should endeavor to "ascertain and effectuate legislative intent." *Jones v. State,* 336 Md. 255, 260, 647 A.2d 1204 (1994). Here, we are therefore required to "ascertain and effectuate" the intent of the Court of Appeals in adopting Rule 4–215(g). *See also Johnson v. State,* 274 Md. 29, 41, 333 A.2d 37 (1975) (quoting *Brown v. State,* 237 Md. 492, 504, 207 A.2d 103 (1965) (stating the meaning of a Maryland Rule "does not depend upon the niceties of definition but upon the reasonable intentment of the language used in the light of the purpose to be effectuated")). In determining intent, we are mindful that the Maryland Rules are to be construed "to secure simplicity in procedures, fairness in administration and elimination of unfair expense and delay." Rule 1–201(a).

■ A plain reading of Rule 2–415(g) shows that the reason an objection to a defect [in any question or answer that can be immediately cured] must be made, in a timely fashion, during the deposition is so that the questioner will have an opportunity, during the deposition, to clear up the problem. The drafters of the rules did not wish a litigant to be prejudiced by a slip of the tongue or any other error that could be easily cured. If it were sufficient merely to utter the word

"objection" when some flaw exists in a question or answer, that purpose oft-times would not be fulfilled. For instance, a questioner, even if he or she is a well-trained lawyer, may not know what "error or irregularity" needs correcting if a specific objection is not made. At deposition, attorneys can, and often do, object to questions for invalid reasons or for no reason at all. Moreover, counsel, although they are not required to do so, often object to questions or answers (e.g., answers containing hearsay) where the error or irregularity could not possibly be corrected even if the problem were brought to the attention of those in attendance at the deposition. Given these well known realities, the interpretation of Maryland Rule 2–415(g) advanced by appellants would allow counsel at deposition to interpose scores of non-specific and frivolous objections and then interpose a valid objection to a defect in a question that could be immediately cured. The barrage of frivolous objections might well cause an opponent to overlook the defect in a question or answer that was immediately curable. Such an interpretation would not fulfill the purpose of the rule and would run afoul of the requirement that the Maryland Rules be interpreted to secure fairness in administration.

In *Collom v. Pierson*, 411 N.W.2d 92 (N.D.1987), the North Dakota Supreme Court was called upon to interpret Subdivision d(3) of Rule 32 of the North Dakota Rules of Civil Procedure, which read:

> Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties, and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition.

*Id.* at 95.

As can be seen, the Rule interpreted in *Collom* is substan-

tively the same as Maryland Rule 2–415(g).[5] In *Collom*, the liability issue was whether a hole in plaintiff's colon was caused by the negligence of plaintiff's two treating doctors or whether the opening developed after surgery through no fault of the physicians. The only expert to testify for the defense was Dr. M. Michael Eisenberg, a general surgeon. He testified, by way of deposition, that the opening in plaintiff's colon was not caused by any negligence on the part of the defendants. During deposition, counsel for plaintiff, Dr. Eisenberg, and one of the defense counsel had the following exchange:

Q [By MR. ZUGER—defense counsel] The bottom line is, do you find any evidence of malpractice or negligence, if you will, whatsoever, on the part of either Dr. Lutz or Dr. Pierson in this case?

A [Dr. Eisenberg]: No.

. . . .

MR. SAEFKE [plaintiff's counsel]: We're going to object on the basis of no foundation.

MR. ZUGER: In what specific regard? He's been through the entire chart. He's read all the depositions. Where's the foundation lacking?

MR. SAEFKE: The question referred to Dr. Lutz and Dr. Pierson. You asked him whether there was any negligence on their part. My objection is there's no foundation for him to answer that question.

MR. ZUGER: And can you be more specific so I can have an opportunity to cure your objection?

MR. SAEFKE: No, I'm not going to try your lawsuit, counsel. You've been in this for some time. You know the qualifications of those gentlemen and their practices and you know the qualification of your witness and his practice. And my objection is that he is not qualified to testify as to whether there was any negligence on the part of the defendants in this lawsuit.

---

**5.** North Dakota Rule 32(d)(3), in turn, is almost identical to Federal Rule 32(d)(3).

MR. ZUGER: And so that I have an opportunity to cure this before I conclude this deposition, where is he lacking in foundational qualifications?

MR. SAEFKE: That's not my obligation, counsel.

*Id.* at 94.

Counsel for plaintiff sought to exclude at trial all of Dr. Eisenberg's testimony based on the fact there was

> no showing in his deposition testimony of his familiarity with the practice of obstetrics and gynecology ... in similar localities nor similar circumstances [and therefore the doctor was not qualified] to testify ... [regarding] the practice of Dr. Lutz in North Dakota.

*Id.* at 95.

The trial judge overruled the objection and admitted Dr. Eisenberg's deposition testimony. On appeal, the North Dakota Supreme Court said:

> Objections to foundation can frequently be obviated by further testimony. Therefore, an objection to foundation at a deposition is futile unless it is sufficiently specific to afford the opposing party opportunity to cure it. *See United States v. Michaels*, 726 F.2d 1307, 1314 (8th Cir.1984): "Foundation objections require specificity." Collom's counsel failed to specify what was lacking. Therefore, we cannot consider Collom's deposition objection to foundation for any of Dr. Eisenberg's testimony.[6]

*Id.*

We interpret Rule 2–415(g) in harmony with the *Collom* court's interpretation of N.D.R. Civ. P. Rule 32(d)(3). We hold that, to preserve a deposition objection to any error or irregularity that might be cured if a timely objection had been

---

**6.** The portion of the *Collom* opinion quoted is dicta because the court went on to say that, even if the objection had been preserved, Dr. Eisenberg had established an adequate foundation for his opinion. Aside from *Collom, supra,* the parties have not referred us to, nor have we found, any other appellate decision that discusses the issue of whether a deposition objection needs to be specific when the conduct of the deposition is governed by a rule similar to Rule 2–415(g).

made at deposition, the objecting party must state the ground for the objection before the conclusion of the deposition, so that the opposing party will have a chance to cure or obviate the error or irregularity. Here, as Judge Heller pointed out, if appellant had specified the ground for his objections at deposition, counsel for S&S could easily have corrected the form of each of the questions to which appellants' counsel objected. Having failed to be specific, the objections to the form of the questions were waived.

## ISSUE III

### Testimony Relating to Whether Corey Davis Was Exposed to Lead–Based Paint When He Lived at 2627 Francis Street

On the morning the trial was to commence, appellants' counsel made a motion *in limine* seeking to prohibit S&S's counsel from presenting any evidence that the source of Corey's exposure to lead paint was at 2627 Francis Street. Counsel argued:

> Certainly, if the [p]laintiffs' are not entitled to the reasonable inference that Francis Street was a contributing source of lead exposure, ... [S&S] cannot now be entitled to that— any kind of inference to their advantage. We therefore ask that any mention of Francis Street not be allowed.

In support of this argument, appellants' counsel told the trial judge that Corey "was never tested for lead while residing at the [Francis Street] property," although he had undergone an FEP screening test. He then noted that an FEP test can be elevated by factors other than lead.

Counsel's statement that Corey had never been tested for lead when he lived on Francis Street was, at best, misleading. Corey moved from the Francis Street address on March 2, 1989, and on the same day he moved into the premises owned by S&S. His blood was tested for lead on March 2, 1989. Also, an FEP screening test was administered on that date. The blood test report, later introduced into evidence, shows Corey's address as 2627 Francis Street on March 2, 1989.

The trial judge next asked appellants' counsel whether Judge Ward's rationale for granting summary judgment was that "the record was void [sic] of any evidence of [lead-based] paint at the [Francis Street] address." Appellants' counsel's reply was, "Yes, it is [sic], Your Honor." As already shown, this answer was inaccurate.

The trial judge granted plaintiffs' counsel's *in limine* motion, saying:

> I will not permit testimony of any expert that the child was exposed to lead at Francis Street address because, one, this [c]ourt—Judge Ward has previously granted judgment indicating that, even looking at the facts in the light most favorable to [p]laintiffs, that there was absolutely no testing of any flaking, chipping paint. And also, there was no lead levels taken of the child at the time either. . . .

> I'm just telling you if you . . . do bring out the condition of the home, you have to also bring out that there was no evidence of lead. The [c]ourt has already granted judgment for the [d]efendants at that address, so I think it should not come out. I think it would be an unfair conjecture.

Appellants argue on appeal that the trial court deviated from her *in limine* ruling during trial and thus committed reversible error. Appellants also argue, more generally, that the court erred in allowing the introduction of any evidence from which the jury might have inferred that the source of Corey's lead poisoning was from the house on Francis Street. Appellees counter that the motion *in limine* should not have been granted in the first place, and in any event, the trial judge committed no reversible error in her evidentiary rulings.

### A. Motion *In Limine*

The two factual grounds upon which the trial judge granted appellants' motion *in limine* were: (1) that Corey was never tested for lead when he lived at Francis Street and (2) that Francis Street was "excluded at summary judgment" as a source of Corey's poisoning because, at the summary judg-

ment stage, plaintiffs could produce no evidence that the house had been painted with lead-based paint. Impliedly at least, appellants contend that the summary judgment ruling constituted the law of the case and Judge Heller was therefore obliged to follow that "law" in making evidentiary rulings during trial. Appellants' premise is fatally flawed. No prior ruling of the court established that Corey had not been tested for lead when he lived at Francis Street or that there was no "lead paint" at the Francis Street premises. Obviously, the law of the case doctrine can have no application concerning an issue that was never decided. *NCAA v. Johns Hopkins University*, 301 Md. 574, 582, 483 A.2d 1272 (1984).

We need not, however, decide whether the *in limine* order should have been granted because appellants fail to point to any instance when the trial judge deviated from her ruling. The *in limine* ruling was narrow and concerned only testimony of experts. Not once did the trial judge allow any expert to testify that Corey was exposed to lead-based paint at the Francis Street premises.

### B. Other Trial Testimony Regarding Francis Street

#### 1. Exhibit 21—Failure to Redact

Plaintiffs' expert, Dr. James, testified that Corey suffered permanent brain injury due to his exposure to lead-based paint at premises owned by S&S. On direct examination, Dr. James did not attribute any injury to Corey due to his residence at Francis Street. On cross-examination, Dr. James was shown defendant's Exhibit 21, which was a medical report indicating that on March 2, 1989, Corey had an elevated lead level of 31 mcg/dl; an elevated FEP level; and an address, at the time the test was administered, at 2627 Francis Street. Defendant's Exhibit 21 was later introduced into evidence over appellants' objection.

Appellants now contend that the trial judge erred in failing to redact the Francis Street address from Exhibit 21 because, according to appellant, the jury could draw the inference that Corey was exposed to lead-based paint at the

Francis Street address merely because he lived there when the test was administered. Appellants also maintain that the court erred in allowing Dr. Charnas to testify that Corey was living at the Francis Street address when he had elevated FEP levels. According to appellants, the jury could "infer" from the Charnas testimony and Exhibit 21 that the source of the lead in Corey's blood was from Francis Street. Even assuming, *arguendo*, that one could draw such an inference,[7] no reversible error was committed. Failure to redact Corey's address caused plaintiffs no harm. Nor did the court's ruling in regard to Dr. Charnas's testimony cause harm, inasmuch as the same evidence had already been admitted, without objection, *prior* to admission of the disputed evidence. Ms. Norwood testified, without objection, that she lived on Francis Street on March 2, 1989. *Myers v. State*, 58 Md.App. 211, 227, 472 A.2d 1027, *cert. denied*, 300 Md. 484, 479 A.2d 373 (1984) (holding that if testimony comes in without objection, but some subsequent evidence to the same effect is later admitted over objection, the later objection is waived).

## 2. Cross-Examination of Dr. James

██ Appellants also contend that the trial court erred in allowing Dr. James to be asked on cross-examination whether he had previously testified at deposition that Corey had been exposed to lead-based paint from some "source" other than the premises owned by S&S. Dr. James responded, "That's correct, yeah." The question was a perfectly valid one that at least potentially weakened the testimony given on direct by Dr. James that Corey had been injuriously exposed to lead paint when he lived at the premises owned by S&S. Thus, the trial judge did not err in overruling trial counsel's objection.

## 3. Failure to Strike an Answer by Charles Runkler

██ Appellant next asserts that the trial judge erred when she failed to grant a motion to strike an answer that Charles

---

7. For a good discussion of the proper test for the legitimacy of an inference, see *Chesapeake & Potomac Tel. Co. of Md. v. Hicks*, 25 Md.App. 503, 524–25, 337 A.2d 744 (1975).

Runkler gave. Mr. Runkler was an employee of S&S. During cross-examinations by appellants' counsel, he said that S&S had a letter in its file stating that "the child [Corey] came here [to S&S's premises] with lead paint," meaning that Corey had suffered from lead poisoning prior to moving into S&S's premises. Plaintiffs' counsel said, "Objection, move to strike." The trial judge sustained the objection to the answer but did not rule on the motion to strike.[8] Appellants were not prejudiced by the failure to strike the answer because defendant's Exhibit 21, which was already in evidence, also showed that Corey suffered from lead poisoning before moving to the Park Heights address. *Bradley v. Hazard Technology Co., Inc.,* 340 Md. 202, 207, 665 A.2d 1050 (1995) (holding that to warrant a reversal appellant must show not only error but prejudice caused by that error).

## ISSUE IV

### A. The Use of Dr. Charnas's Deposition

██ Trial in this case was set by the assignment office in January 1996. The scheduled trial date was September 18, 1996. Defense counsel immediately notified Dr. Charnas that he would be needed as a witness, and Dr. Charnas agreed to be present on September 19, 1996. His availability was confirmed by defense counsel in June and August 1996. On September 8, 1996, Dr. Charnas notified defense counsel that he would be unavailable to testify on September 19, 1996, because he would "be traveling to a conference in Utrecht, Holland." Dr. Charnas said that if trial lasted until September 23, 1996, he would be available to testify on that date. Defense counsel did not anticipate that trial would last until September 23, and as a consequence, he promptly notified plaintiffs' counsel of the problem and scheduled Dr. Charnas's *de bene esse* deposition for 11:00 a.m. on September 17, 1996.

---

8. As discussed in connection with Issue VII, *infra,* the trial judge told the jury in her instruction that whenever she sustained an objection to an answer the jury should disregard that answer.

The deposition was held on that date, and counsel for the plaintiffs was in attendance.

On the morning of trial, plaintiffs' counsel moved "to strike" Dr. Charnas's deposition because the deposition had been taken only one day earlier and, as a consequence, he had not had time to file a brief with the court regarding the "numerous objections" he had made during the deposition. He also said that he feared that the court would have insufficient time to review his objections carefully prior to ruling on them and that defense counsel would have insufficient time to edit the videotape after the court made its rulings. The trial judge heard argument on the motion and concluded:

> There is truly no way one could excuse Dr. Charnas's refusal to be here today, especially after defense counsel had timely and apparently repeatedly notified him of the date. So, if that were the reasoning and if he were not here, the [c]ourt wouldn't have granted a postponement because this case has been postponed before for part of that very reason.
>
> On the other hand, there was the opportunity, and indeed, both parties took advantage of it, to do the video deposition so that his testimony could be presented, and I'm going to permit that video deposition transcript to go forward. I don't see any prejudice to [p]laintiffs because there's no problem with the [c]ourt reviewing the transcript and the deposition and making rulings, so that those rulings will go forward before it's played to the jury in this courtroom. All courtrooms are different. But now that I have video equipment, which I never used to have, we put the deposition in the machine. It's very easy to manually—even an attorney can do it. Hold it quietly while one doesn't hear what one has excluded. So, as long as I get timely objections, we will make sure that the video deposition is not shown to the jury until 1 have an opportunity to rule on it. Okay?
>
> MR. KETTERMAN [COUNSEL FOR S&S]: Your Honor, we will have a written transcript [of the Charnas deposition] today if Your Honor would like to see that in advance.

THE COURT: Well, to the extent you have one and can give it to me, that means I can read it ... either this evening or late this afternoon. And that saves you all time and I'd greatly appreciate it.

On September 23, 1996, appellants' counsel filed written objections to portions of Dr. Charnas's video deposition. The video deposition was shown to the jury on September 24th and 25th.

Appellants argue that Judge Heller "abused her discretion" in failing to strike the deposition because "the procedures outlined in Rule 2–416(g) had not been followed" and, as a consequence, appellants' counsel "was forced to spend time on preparation of written objections to the deposition rather than spending time on trial preparation." While appellants do not deign to specify which of the procedures set forth in section 2–416(g) were not followed, we presume they refer to the requirement that objections "to all or part of the deposition shall be made in writing within sufficient time to allow for rulings on them and for editing of the tape *before* the trial." (Emphasis added.) Here no ruling or editing could be done before trial since the transcript was not yet available. This problem, however, was through no neglect of the parties or their counsel. At the point the videotaped deposition was shown to the jury, appellants' counsel had the deposition transcript for several days and had enough time to prepare and file a five-page document adumbrating plaintiffs' grounds for some twenty-five objections to various (alleged) errors and irregularities in Dr. Charnas's deposition.[9] Under these circumstances, appellants have failed to show how they suffered any prejudice by receiving the transcript late and therefore have failed to show grounds for reversal. *Bradley, supra,* 340 Md. at 207, 665 A.2d 1050.

The suggestion that appellants were prejudiced by their counsel's being diverted from trial preparation by the necessi-

---

9. Plaintiff's counsel "submitted without argument" with regard to numerous other objections.

ty of drafting written objections after the trial commenced is purely make-weight. The trial started on September 18, 1996; the deposition was introduced into evidence six days later. The transcript of the deposition was delivered on September 18, 1996. Thus counsel had adequate time both to prepare for trial and file written objections in compliance with Rule 2–416(g). The trial judge did not abuse her discretion in allowing the deposition to be used.

## B. Qualification of Dr. Charnas

■ Appellants contend that Dr. Charnas was not qualified to "determine what sources of lead the children were exposed to result[ed] in lead poisoning," and therefore the trial judge erred in allowing the expert to express any causation opinion. Appellants note that Dr. Charnas was neither "a toxicologist or a pediatrician" and, as a consequence, never had "the responsibility of treating children for their lead poisoning. He only handled their neurological symptoms."

■ A witness is qualified to testify as an expert when he exhibits such a degree of knowledge as to make it appear that his opinion is of some value to the factfinder, regardless of where or how the knowledge was gained. *Yost v. Early*, 87 Md.App. 364, 373, 589 A.2d 1291, *cert. denied*, 324 Md. 123, 596 A.2d 628 (1991). In *Baltimore Gas & Elec. Co. v. Flippo*, 112 Md.App. 75, 98, 684 A.2d 456 (1996), *cert. granted*, 344 Md. 719, 690 A.2d 525 (1997), we pointed out:

> Broad discretion is vested in the trial court with regard to expert testimony, and that discretion will not be disturbed on appeal absent an error of law or fact, a serious mistake, or a clear abuse of discretion ... [O]bjections attacking an expert's training, expertise or basis of knowledge go to the weight of the evidence and not its admissibility.

*See also Tapscott v. State*, 106 Md.App. 109, 664 A.2d 42 (1995), *aff'd*, 343 Md. 650, 684 A.2d 439 (1996); *Smith v. Pearre*, 96 Md.App. 376, 395–96, 625 A.2d 349, *cert. denied*, 332 Md. 454, 632 A.2d 151 (1993).

Dr. Charnas is a Board Certified neurologist, a discipline that involves the study of diseases of the nerves and the brain. He received training as a resident at Johns Hopkins Hospital and subsequently served with the National Institutes of Health. He has taught as an instructor and assistant professor of neurology at Johns Hopkins Hospital and has had some experience in treating children who suffer from lead poisoning.

The trial judge, in ruling on Dr. Charnas's qualifications, noted that she had read his entire deposition, and based on the fact that Dr. Charnas had treated children with lead poisoning, she believed he was qualified to express an opinion as to causation. The court also observed that Dr. Charnas's

career had focused on study of the nervous system and things that produce intelligence.... I would say that this is directly relevant to the reported effects of lead exposure. So, those are just a few examples. But after reviewing the entire thing, I thought he could give testimony on causation, and the objections go to the weight.

Appellants assert:

The sole issue was whether Dr. Charnas had any training, knowledge or experience with determining what sources of lead that children were exposed to resulting in the lead poisoning. The record was clear that Dr. Charnas only saw the children after they had been treated and diagnosed with lead poisoning. He never was involved with the investigation or determining the sources of the exposure. Dr. Charnas was an expert in brain damage, not lead paint detection. His lack of expertise was reflected in his testimony that 4716 Park Heights Avenue was a "relatively lead free source." The violation notice issued for Park Heights listed 38 areas that were positive for lead.

We begin by observing that the contents of the violation notice did not demonstrate Dr. Charnas's lack of expertise, nor did it necessarily contradict his opinion that the Park Heights address was "relatively lead free." Only deteriorated lead-based paint can cause harm to children, and according to the violation notice, of the thirty-eight areas that were positive

for lead paint, thirty-two were intact and only six had flaking paint.

It is true that, as a neurologist, Dr. Charnas would not ordinarily be called upon to investigate, or to give an opinion, as to the exact source of the lead poisoning that afflicted his young patients. But he was not called upon in this case to opine as to the exact source of the lead poisoning. Instead, he was only asked his opinion as to whether the lead poisoning had its source at the premises owned by S&S. Because the witness was a Board Certified neurologist, it was certainly reasonable for Judge Heller to infer that he had special knowledge as to the effect of the DMSA medication on blood lead levels and as to the significance of the lead levels and FEP levels found in Corey's blood on March 2, 1989, and thereafter. As more fully explained in the excerpt from Dr. Charnas deposition set forth under Issue II, his causation opinion was based on the facts that (1) Corey's lead-level was elevated when he moved to premises owned by S & S; (2) it takes three or four months for lead levels (FEP) to go down; and (3) Corey's FEP level remained "more or less unchanged" from the date he moved to the Park Heights premises until he commenced treatment with DMSA in the summer of 1989. According to Dr. Charnas, these constant FEP levels indicated that the Park Heights address was not the source of the lead in Corey's blood.

## ISSUE V

### Questioning of Stanley Rochkind

In order to prove that S&S was negligent, plaintiffs were required to prove that S&S's principal, Mr. Rochkind, had "reason to know" that the Park Heights address contained deteriorated leadbased paint that was dangerous to young children. *Richwind Joint Venture 4 v. Brunson*, 335 Md. at 673–74, 645 A.2d 1147 (1994). As stated in *Brown v. Wheeler*, 109 Md.App. at 721, 675 A.2d 1032 (1996),

The "reason to know" standard requires some knowledge—not necessarily actual knowledge of all relevant facts—but

enough to cause a person of ordinary intelligence or one of ".... 'superior intelligence ... [to] either infer the existence of the fact in question or ... regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist.' " *Richwind,* 335 Md. at 677 [645 A.2d 1147]. If a landlord or property manager has notice of the existence of a specific defect or hazard on particular premises, created by the defect, even if incomplete, may be met by evidence of knowledge generally possessed by persons of ordinary intelligence.... Additionally, landlords and property managers frequently may have actual knowledge that is superior to other persons and they, thereby, will be held to have "reason to know" of a hazard which, when combined with knowledge of a defect on particular premises, will create a jury question.

 Mr. Rochkind was called by appellants as an adverse witness. He readily admitted that he knew, as of the date that he took Ms. Norwood's rental application: (1) that lead-based paint could cause injury to children; (2) that older houses in Baltimore City often contained lead-based paint; and (3) that children had been made ill as a result of being exposed to chipping and flaking lead-based paint. He also knew "whatever came out in the [news]paper or whatever information that was disseminated to the public" in regard to safe and unsafe lead levels. Thus, it was not part of S&S's defense that plaintiffs had failed to show that S&S had knowledge of the dangers of deteriorated lead-based paint. By Mr. Rochkind's direct testimony, appellants proved more than "reason to know" on the landlord's part; appellants proved actual knowledge. The only "knowledge" issue in dispute was whether Mr. Rochkind had knowledge of deteriorated lead-based paint on the premises owned by S&S when Corey moved there in early March 1989. Nevertheless, appellants contend that the trial judge abused her discretion in preventing plaintiffs "from presenting the full extent of" Mr. Rochkind's knowledge about the dangers of lead-based paint. In this regard, appellants contend the trial judge erred in

sustaining S&S's objections to the following questions asked of Mr. Rochkind:

1. When you brought S&S Partnership in 1986, how many properties did you acquire?

2. By 1989, isn't it true, you owned and managed approximately 1,000 properties in Baltimore City?

3. Was the lead paint violation you received in June 1989 for the Park Heights premises the first lead paint notice you had ever received for any property?

Although appellants made no formal proffer as to what answers they expected, it seems obvious that the answers would have been that Mr. Rochkind owned and managed approximately 1,000 properties in 1989 and that sometime prior to June 1989 he had received a lead-paint violation notice for at least one of his other properties.

In the face of the admissions by Mr. Rochkind, questions regarding the number of properties that Mr. Rochkind owned or managed or the number of times he or his company had received lead paint violation notices prior to March 1989 could add nothing material to the case because the witness had admitted "actual knowledge" of the dangers of deteriorated lead-based paint. In other words, when an issue is not in dispute, facts probative of that issue are irrelevant. Judge Heller did not err in sustaining S&S's objections.

## ISSUE VI

In the presentation of its defense, S&S introduced numerous documents that were found in S&S's records for the years 1988 and 1989. Appellants contend that these records did not come within the business records exception to the hearsay rule and therefore should have been excluded. Maryland Rule 5-803 reads, in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(b) **Other Exceptions.**—

\* \* \*

(6) *Records of Regularly Conducted Activity.*—A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

The purpose of Rule 5–803(b)(6) and its statutory counterpart found in Maryland Code Annotated, Courts and Judicial Proceedings article, section 10–101 (1995 Repl.Vol.), is to avoid the common law rule that witnesses should speak from personal knowledge and to bring "the rules of evidence nearer to the standards in responsible action outside the court." *Beach v. State,* 75 Md.App. 431, 437, 541 A.2d 1012 (1988) (quoting *Brown v. State,* 1 Md.App. 664, 666, 232 A.2d 820 (1967)).

Prior to introducing its business records, S&S called Charles Runkle, its Vice–President. Mr. Runkle testified that since 1991 he had acted as manager for properties owned by S&S. He further testified that his predecessor as property manager was one Jeffrey Squire. For about six weeks prior to his leaving his job with S&S in 1991, Mr. Squire taught Runkle the S&S system for keeping records. Through Runkle's testimony, S&S indisputably met all the requirements of Rule 5–803(b)(6) with one possible exception. According to appellants, S&S failed to prove that the records were "made at or near the time of the act ... mentioned in the records."

Appellants contend that the records should not have been admitted because Runkle was not employed by S&S when the records were made, and thus he had no first-hand knowledge as to when the records were made. The same basic contention was made and rejected by the Court of Appeals in *Killen v. Houser,* 251 Md. 70, 76, 246 A.2d 580 (1968):

> Houser received the corporate records when he purchased the companies and has been their custodian since. The records were those that normally and customarily are kept by corporations in ordinary course. There was nothing to show these were not the records received by Houser or that they were not bona fide and unaltered. The statute does not specify that the custodian of the record be he who was such at the time the record was made. If it did, it would lose much of its utility and effectiveness.

As stated by 6 McLain, *Maryland Evidence* § 803(b).1, at 379 (1987):

> The foundation [for business records] is usually laid through the testimony of a qualified witness. But the foundation requirements for this exception need not always be met by testimonial evidence. In some cases the court may properly conclude from the circumstances and the nature of the document involved that it was made in the regular course of business.

(Footnotes omitted.)

This principle was utilized in *Beach,* 75 Md.App. at 435–39, 541 A.2d 1012, in which a letter to a judge, printed on Second Genesis stationery, stamped received by the judge and purporting to be from a Second Genesis counselor, was held to be admissible as a business record despite the fact that no agent from Second Genesis authenticated the document. In *Beach,* the letter was admissible because the circumstances indicated the document's trustworthiness.

The S&S records here in question were invoices and letters. Except for one invoice, which has no relevance in this appeal, all the work invoices and letters were dated, as were all

handwritten notations on the letters. The dates shown on the invoices appear to be contemporaneous with the dates that the work was supposed to be performed. These facts, coupled with Runkle's testimony as to how S&S customarily kept its records, were sufficient to indicate the trustworthiness of the documents and to meet the requirement that records must be made at or near the time of the act or event recorded.

■ In addition to arguing that the trial judge erred in admitting any of S&S's records, appellants also contend that, even assuming that some of the records were properly admitted, the court erred in admitting a notation in a letter, dated September 14, 1989, from property manager Jeffrey Squire to Angela Norwood. The letter said:

> We have just received a lead paint notice for your house. The notice is quite extensive. As I am sure you are aware, there should be no children or pregnant women living in the house at this time, and they should not return to the house until the notice is abated. While the work is in progress, the house cannot be occupied by anyone, and you will need to cooperate with us in moving your personal items out.
>
> Please contact me when you have complied with the above, so we can schedule work to proceed.

At the bottom of the letter is a note, in Mr. Squire's handwriting, dated September 20, 1989:

> Visited property today[;]
>
> told tenant *all* of the children should be out of house. She [Ms. Norwood] is unable to find alternative housing. I told her I would get back to her. *Tenant [Ms. Norwood] said the lead poisoning of her child was not from our house.* . . .

(Emphasis added.)

Appellants argue that the underlined portion of Mr. Squire's note "was clear hearsay within hearsay and [a]ppellee failed to establish the necessary exception under Rule 5–80[5]." [10] The

---

10. In their brief, appellants cite Maryland Rule 5–806 rather than 5–805. This mistake obviously was inadvertent. Rule 5–806 concerns

trial court ruled that, because it was a statement of a party, it was admissible. Furthermore, appellants complain it was error to admit the notation because appellee failed to establish that the declarant/author of the note, Jeffrey Squire, was unavailable by "process or other reasonable means. Rule 5–804." Appellants go on to say that the mere fact that Mr. Squire was no longer employed by the appellee does not meet the burden to establish unavailability.

■■■ The document itself, as we have demonstrated, was admissible under the business records exception. Therefore, there was no requirement that Mr. Squire be produced as a witness. Rule 5–804 has no application. But the fact that a statement is included in a business record does *not necessarily* mean that the statement contained in the note was admissible. Information from a person who is not a part of the business and has no duty to report will not be admissible simply because it is

> included in a business record. Because that person does not have an identity of interest with the business, there is no circumstantial guarantee for his or her sincerity. For example, statements made to a police officer by non-police witnesses or parties to an accident and incorporated within the police report will not be admissible under the business records exception. The statement of the non-business person is properly admissible only if it falls within another hearsay exception or is offered for a nonhearsay purpose.

6 McLain, *Maryland Evidence* § 803(b).1, at 382 (footnotes omitted).

Ms. Norwood has no business duty to report her opinion as to whether Corey was poisoned at the house owned by S&S. Nevertheless, her opinion comes within the hearsay exception set forth in Rule 5–803(a)(1), which provides that a "party's own statement, in either an individual or representative capacity" is not excluded by the hearsay rule even though the

---

attacking and supporting the credibility of witnesses and is not germane to the argument advanced by appellants.

declarant is available as a witness. Because S&S met the requirements of both Rule 5–803(a)(1) and Rule 5–803(b)(6), the notation on the September 14, 1989, letter was admissible.

## ISSUE VII

Appellants complain that Runkle "was allowed to testify on numerous occasions as to matters not within his personal knowledge." They then proceed to list two questions answered by Runkle as "examples" of the court's "error." As to the first example, the issue is not preserved because at trial appellants failed to object to either the question or answer. *Brazerol v. Hudson,* 262 Md. 269, 275–76, 277 A.2d 585 (1971). The second "example" involves a comment Runkle made in regard to an invoice dated February 1989, which was shown to him. He commented that the invoice "made no mention" of "any flaking paint." Appellants' counsel objected to this answer, and the objection was overruled. Whatever problems there may be with Runkle's answer, lack of personal knowledge is not one of them. Once the document was shown to the witness, he obviously had "personal knowledge" of what was written in that document.

Appellants next complaint that, during cross-examination, Runkle "made numerous statements [in regard to subjects about which] he had no personal knowledge." Appellants then list seven examples. At trial appellants never objected to any of these answers, nor did counsel move to strike the answers. These objections were therefore not preserved for appellate review.

Another matter that dissatisfied appellants is that the trial judge asked Runkle, without objection, what S&S did in this case when it learned that the City had filed a lead-paint violation notice against the property. The witness replied that "the property manager ... would have talked to the tenant [about the violation]." The answer was objected to by appellants' counsel and the objection was sustained. Counsel then moved to strike the answer. The trial judge merely reiterated, "I am going to sustain the objection." Appellants assert

that the trial judge erred by "refus[ing] to strike" this answer. Appellants were not harmed by this answer. As already stated, the S&S records show that agents of S&S *did* talk to Corey's mother about the violation on September 20, 1989. In any event, in her instructions to the jury at the end of the case, the trial judge said that whenever she sustained an objection to an answer the jury should "disregard" the answer because it "was not evidence." This instruction was the functional equivalent of directing that the answer be stricken.

## ISSUE VIII

■ Appellants asked the trial judge to give the following instruction:

> Where a landlord undertakes to repair or improve the rented premises, he must exercise reasonable care in making such repairs or improvements. If you had the jury find that the [d]efendant, or his agents, were negligent in any manner with the repair of the property, and that the [p]laintiff sustained an injury as a result of that negligence, you may find the [d]efendant liable for those injuries sustained.

The court declined to give the instruction. In this regard, appellants point out that after Corey moved into the premises the landlord installed some additional kitchen cabinets. While this is true, there was no evidence produced that the landlord or the agents of the landlord failed to "exercise reasonable care in making such repairs or improvements." In fact, plaintiffs introduced no evidence whatsoever as to the *manner* or methods used in making the repairs. Accordingly, the trial judge did not err in denying the instruction because it was not supported by the evidence.

Appellants next contend that the trial judge committed reversible error by failing to instruct the jury, pursuant to Maryland Pattern Jury Instruction MPJI–CIV. 18.3 that:

> A reasonable person changes his conduct according to the circumstances and dangers he knows or should know exist.

Therefore, when the danger increases, a reasonable person acts more carefully.

A trial judge is permitted wide discretion as to the form of jury instructions, and in the absence of a clear abuse of that discretion, an appellate court will not reverse for failure to give a requested instruction. *See, e.g., Blaw–Knox Constr. Equip. Co. v. Morris,* 88 Md.App. 655, 666–67, 596 A.2d 679 (1991). Appellate courts should not "put the 'trial judge in a straightjacket and prescribe or adopt a formula to be used and followed by him,' with respect to instructions to the jury. *State, use of Taylor v. Barlly,* 216 Md. 94 [100, 140 A.2d 173] (1958) [ (citing *Feinglos v. Weiner,* 181 Md. 38, 48 [28 A.2d 577] (1942)) ]." *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 612, 143 A.2d 627 (1958). "No particular form is prescribed as to the manner in which the trial judge should instruct the jury other than that the instruction should cover the law of the case." *Barone v. Winebrenner,* 189 Md. 142, 145, 55 A.2d 505 (1947). Moreover,

[t]he average jury of today is composed of intelligent people. For the main part, they generally know and understand what is going on in a trial, and realize the purport of the judge's charge. It is unnecessary, in order not to be misleading or confusing, for the court to set forth in minute detail the limitations of every conceptual interpretation that might be placed upon this charge. The purpose of oral charges is to tell the jury in simple words what the law is in the case before them, and [the appellate courts] will not be too particular in criticizing the words used if the result be sufficient.

*Hartman v. Meadows,* 243 Md. 158, 163, 220 A.2d 555 (1966).

According to appellants, the instruction found in MPJI–CIV. 18.3 was warranted because S&S "was specifically notified" of the existence of flaking lead-based paint on the leased premises in June 1989 but waited "at least three months" before taking action.

The proposed instructions gave the jury no information as to the law that had not been already covered by the

court's thorough instructions. The court instructed the jury that negligence "is doing something that a person using ordinary care would not do, while not doing something that a person using ordinary care would do." The court then explained that "ordinary care means that caution, attention or skill a reasonable person would use *under similar circumstances.*" (Emphasis added.) The trial judge went on to give detailed instructions with respect to violation of City Ordinances and in regard to a landlord's duty of care when the landlord knows or should know of the existence of flaking and chipping lead-based paint and with respect to violation of City Ordinances. The violation notice gave appellants actual knowledge of deteriorated lead-based paint on the leased premises. The jury was adequately informed of the landlord's duty of care after the landlord received such a violation notice.

Reading the instructions as a whole, appellants were not prejudiced by the failure to give the instructions found in MPJI–CIV. 18.3.

### ISSUE IX

In its answer on the special verdict sheet, the jury found that S&S had violated the Consumer Protection Act but that S&S was "not negligent in regard to the presence of lead hazards at 4716 Park Heights Avenue." Appellants contend that the two answers on the verdict sheet were "inconsistent," and therefore the trial court "abused its discretion" in denying a new trial. Appellants do not argue that the verdicts were irreconcilably inconsistent, nor do they allege any "actual irregularity."

"Inconsistent jury verdicts are generally not sufficient grounds for an appellate court to reverse a jury verdict" unless there is proof of "actual irregularity." *Eagle–Picher v. Balbos,* 84 Md.App. 10, 35–36, 578 A.2d 228 (1990). Inconsistency in civil verdicts often is the result of compromise to reach unanimity or mistake; nevertheless, "verdicts cannot be upset by speculation or inquiry as to such matters." *Id.*

On the other hand, a verdict that is irreconcilably inconsistent cannot be allowed to stand. *S & R, Inc. v. Nails,* 85 Md.App. 570, 590, 584 A.2d 722 (1991), *judgment vacated on other grounds,* 334 Md. 398, 639 A.2d 660 (1994). A verdict is irreconcilably inconsistent "[w]here the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict for the defendant." *Id.* Here, of course, even if we were to consider the two answers inconsistent, neither answer would require a "verdict" for the plaintiffs because the jury's third answer was that Corey's injuries were not caused by S&S's violation of the Consumer Protection Act (CPA).

In any event, the answers to the questions on the special verdict form were not inconsistent. S&S produced evidence that shortly before Corey moved into the premises, S&S completely painted the interior of the house. This evidence was contradicted by testimony introduced by plaintiffs. Both parties agreed that the outside of the premises had not been recently painted when plaintiffs' tenancy began. The jury was instructed that to violate the CPA, "the plaintiffs must show [that] at the time the lease was entered into there was peeling, chipping or flaking lead-based paint of which the landlord had [notice], and did not inform the tenant of that condition or [tell them] that it was hazardous to young children." The jury was further instructed that "the violation of a statute or a city housing code which is a cause of [p]laintiff's injury may be considered as evidence of negligence." The jury could well have decided: (1) that, at the time of the lease, S&S violated the CPA because S&S knew or should have known of the deteriorated lead-based paint on the exterior of the leased premises but did not tell the tenants of the potential hazard; (2) that the interior paint was intact, having been recently painted; and (3) that the deteriorated lead-based paint on the exterior of the house caused Corey no injury. Therefore, applying the court's instructions, violation of the CPA should not be considered "as evidence of negligence."

### ISSUE X

Appellants' final argument is as follows:

The trial court's general conduct throughout the trial substantially deprived the appellant of the right to a fair trial.

Although a trial court's general conduct is not sufficient grounds for reversal, and the number of rulings against a party is not a relevant factor, the numerous erroneous rulings made by this trial court substantially deprived the [a]ppellant [of] a fair trial and thus is grounds for a reversal. *Sun Cab Co. v. Walston*, 15 Md.App. 113 [289 A.2d 804] (1972).

What appellants characterize as "numerous erroneous rulings" are those rulings of the trial court that we have already considered and rejected. In addition, appellants point to two additional "errors." First, the appellants attempted to introduce a letter, dated January 1988, found in S&S's file, in which a former tenant at the Park Heights residence complained of the house being wet from rain and snow and also complained of water leaking from the upstairs bathroom down to rooms below. Ms. Norwood, who moved to the premises fifteen months after the letter was written, did not complain of any of these problems during her tenancy. The trial judge sustained an objection to the introduction of the letter on grounds of relevancy. Although appellants say in their brief that the trial judge erred in this ruling, they do not even attempt to show how the evidence was relevant nor do they explain in what way the ruling was erroneous or demonstrate how they were prejudiced. The contention is therefore waived. *Beck v. Mangels*, 100 Md.App. 144, 149, 640 A.2d 236 (1994) (stating if appellant fails to provide argument in support of a contention, that contention is waived); *Bradley v. Hazard Technology Co., Inc.*, 340 Md. 202, 207, 665 A.2d 1050 (1995) (holding to succeed on appeal, appellant must show not only error but that prejudice resulted from that error).

Lastly, appellant claims that S&S produced "poor quality" copies of business records that appellants had subpoenaed for

trial; that initially the trial judge erroneously failed to order S&S to produce the originals; that the trial judge "would not allow the [a]ppellant[s] to make a complete record as to why the copies were not legible"; and that the trial judge later ordered S&S to produce the originals, but the trial judge erred in failing to grant a recess of the trial in order for the "[a]ppellant[s] to have sufficient time to review the [original] records." In their brief, appellants fail to specify which documents, among the many business records that were introduced, they contend were illegible. Aside from that problem, assuming, *arguendo,* that the court's rulings in this regard were erroneous in every respect, reversal is not warranted due to appellants' failure to show, or even attempt to show, prejudice. *See Bradley, supra.*

JUDGMENTS IN FAVOR OF EUGENE GOODMAN, ANNE GOODMAN, MARC ATTMAN, AND DEBRA ATTMAN REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS; REMAINING JUDGMENT AFFIRMED; COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY EUGENE GOODMAN, ANNE GOODMAN, MARC ATTMAN, AND DEBRA ATTMAN.